**In re Herbert J. SILLDORFF and Sandra K. Silldorff, Debtors.**

**William H. CHRISTISON, Trustee, Plaintiff,**

**v.**

**Henry P. SLANE, John T. McConnell, Steven R. Coch, Thomas F. Driscoll, and Jan Meyer, Trustees of the Peoria Journal Star, Inc., Basic and Supplemental Employee Stock Ownership Plan, and Sandra K. Silldorff, Defendants.**

**In re Everett E. HOWARD and Judy Ann Howard, Debtors.**

**William H. CHRISTISON, Trustee, Plaintiff,**

**v.**

**Henry P. SLANE, John T. McConnell, Steven R. Coch, Thomas F. Driscoll, and Jan Meyer, Trustees of the Peoria Journal Star, Inc., Basic and Supplemental Employee Stock Ownership Plan, and Judy Ann Howard, Defendants.**

**Nos. 88–1185, 88–1198.**

United States District Court, C.D. Illinois, Peoria Division.

Feb. 17, 1989.

---

Andres W. Covey, Baymiller, Christison & Radley, Peoria, Ill., for plaintiff.

Charles E. Covey, Covey & Litterst, Peoria, Ill., for Sandra Sildorff and Judy Ann Howard.

Stephen A. Kouri, Vonachen, Lawless, Trager & Slevin, Peoria, Ill., and Robert R. Watson, Sidley & Austin, Chicago, Ill., for all other defendants.

## ORDER

MIHM, District Judge.

### FACTS

Sandra K. Silldorff and Judy Ann Howard (Debtors) have been employees of the Peoria Journal Star, Inc. (Company) for a number of years. Each filed petitions for relief under Chapter 7 of the Bankruptcy Code. The debtors' pre-petition debts have been discharged.

The Company established its Basic Employee Stock Ownership Plan and its Supplemental Employee Stock Ownership Plan on January 1, 1983 (cumulatively, these will be referred to as the Plan). The Debtors have been participants in the Plan since that date.

Contributions to the Basic Plan account have come from four sources:

(A) Salary reduction contributions (SRC). These are voluntary contributions, described in § 401(k) of the Internal Revenue

Code, in amounts determined by the participant within guidelines set by the Company.

(B) Matching employer contributions (MEC). These are contributions made by the Company in addition to the SRC's elected by the participant. The Company contributes $1 in MEC to the Basic Plan for each $1 of SRC contributed by the employee up to a maximum of 5% of participant compensation.

(C) Regular Employer Contributions (REC). These are automatic employer contributions and are not dependent upon whether or not SRC's have been contributed. No withdrawals of REC's are permitted while the participant is still in service.

(D) PAYSOP contributions. These employer contributions are made without need for election on the part of participants and were automatically rolled over into the Basic Plan when the former plan was merged into the Basic Plan on June 1, 1987. No withdrawals from PAYSOP accounts are permitted while the participant is still in service and no loans are permitted from PAYSOP accounts.

The Trustee of the Debtors' bankruptcy estates sought to reach the Debtors' assets in their respective Basic and Supplemental Plan accounts. The bankruptcy court referred the issue to this Court; this Court subsequently denied a motion to withdraw the reference because this Court determined that it would be necessary to consider non-bankruptcy federal law (i.e., ERISA) to determine whether the assets could be reached. Presently before the Court are cross-motions for summary judgment from the bankruptcy Trustee and from the Plan trustees.

Copies of the Basic Plan and the Supplemental Plan are included within the record. Generally, the Company is the plan administrator with respect to the Plans, having responsibility for day-to-day operation of the Plans. The Company has delegated this responsibility to two six-member administrative committees, one for the Basic Plan and the other for the Supplemental Plan. The assets of the Plan are held in trust pursuant to the terms of the Plans. They are administered by the five individual trustees named as Defendants in this suit. These individuals are also directors and officers of the Company.

The parties have stipulated that the Plans are qualified employee stock ownership plans within the meaning of §§ 401(a) and 4975 of the Internal Revenue Code of 1986 and are employee stock ownership plans as defined in § 407(d)(6) of the Employee Retirement Income Security Act of 1974 (ERISA). Also stipulated is that the Plans also constitute pension plans as defined in ERISA and are thus subject to the anti-alienation and assignment provisions of ERISA.

In order to qualify as ERISA plans, the Plans must provide that benefits accrued thereunder may not be assigned or alienated. 29 U.S.C. § 1056(d) and 26 U.S.C. § 401(a)(13). The Basic Plan states that:

> Except as specifically otherwise provided in § 11.1, a Participant shall in no event be entitled to any payment, withdrawal, or distribution under the Plan while in Service; nor may his interest in the Plan as a Participant, or after his participation has ended, or that of his Beneficiary, be assigned or alienated by voluntary or involuntary assignment, except as provided in § 12.2 below.

Basic Plan § 12.1; Supplemental Plan § 11.1 is a parallel provision. Section 12.12 allows assignment or alienation pursuant to a domestic relations order.

The Plans also provide in § 10.5 that distributions shall be made to a participant only upon the participant's retirement, disability, death, or termination of employment. In addition, pursuant to a requirement under ERISA § 10.53(e)(1), vested accrued benefits with a present value exceeding $3,500 may not be distributed without the participant's consent.

Loans may be made to participants in the Plans at the discretion of the administrative committees under the conditions and criteria specified in § 11 of the Basic Plan and by the administrative committees (and subject to the requirements of § 408 of ERISA). The conditions and criteria of the administrative committees are set forth in

loan policy sheets which are distributed to participants inquiring about loans. These criteria provide that loans may only be made from certain accounts. They must not exceed one-half of the participant's vested interests in these accounts and they must be made in amounts of $5,000 or more. A participant's spouse must have consented to any loan as of the petition date. The loan must be for one of three permissible purposes.

In addition, an in-service distribution may be made to a participant at the discretion of the administrative committees upon proof by the participant of extreme financial hardship as defined in Treasury Department Regulations promulgated under § 401(k) of the Internal Revenue Code. If granted, such a distribution is made only from vested balances in the participant's SRC and MEC accounts. Any such distribution is subject to income tax and an additional excise tax. As of January 1, 1989, no MEC's and no earnings on SRC's may be distributed while the participant is still in service.

In order to determine whether the trustee can reach these assets, it is first necessary to determine whether the Debtors' interests in the Plans are property of the estate, either because no ERISA plan is exempt under the Bankruptcy Code or because this plan does not qualify as a spendthrift trust under Illinois law and is thus not exempt. Second, it is necessary to determine whether, even if the debtor's interest in the Plans is property of the estate, the bankruptcy Trustee has any right to demand distribution at the present time. If the Court finds that the bankruptcy Trustee has a right to distribution, it will also be necessary to determine the proper amount to be distributed.

## DISCUSSION

Whether the Debtors' vested interests in the Plans are included in the respective bankruptcy estates is governed by § 541 of the Bankruptcy Code. Section 541(a)(1) provides that the commencement of a case creates an estate of all legal or equitable property interests of the debtor as of the commencement of the case. Section 541(c)(1)(A) provides that a property interest becomes property of the estate notwithstanding provisions in any agreements, transfer instrument, or non-bankruptcy law that restricts or conditions transfers of such interest by the debtor. However, § 541(c)(2) provides that a restriction on the transfer of a beneficial interest of a debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable under the Bankruptcy Code.

■ With only one exception, every circuit court of appeals which has considered the above sections of the Bankruptcy Code as applied to the interest of a debtor in an ERISA pension or profit sharing plan has held that the interest is included in the bankruptcy estate unless the plan qualifies as spendthrift trust under state law. *See, In re McLean v. Central States, Southeast and Southwest Areas Pension Fund,* 762 F.2d 1204 (4th Cir.1985); *In re Daniel,* 771 F.2d 1352 (9th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313; *In re Lichstrahl,* 750 F.2d 1488 (11th Cir. 1985); *In re Goff,* 706 F.2d 574 (5th Cir. 1983); *Regan v. Ross,* 691 F.2d 81 (2nd Cir.1982). *Cf., In re Graham,* 726 F.2d 1268 (8th Cir.1984) (holding that all ERISA qualified plans are automatically part of the bankruptcy estate). The Seventh Circuit has not ruled on this issue.

In *In re Goff,* supra, the debtors claimed that their ERISA qualified Keogh plans were excluded from property of the bankruptcy estate by operation of § 541(c)(2). The debtors argued that the restriction against assignment or alienation contained in their plans pursuant to the requirements of ERISA in the Internal Revenue Code was "enforceable under applicable non-bankruptcy law." The court concluded that Congress intended to exclude only spendthrift trusts under § 541(c)(2). The court first noted the legislative history of this section, in particular, the House Report which accompanied the bill. At one point this House Report stated, "paragraph (2) of subsection (c), however, preserves restrictions on the transfer of a spendthrift trust to the extent that the restriction is

enforceable under applicable non-bankruptcy law." H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 369 (1977), reprinted in 1978 U.S. Code Cong. & Admin.News 5787, 5963, 6325. Even more significant, in providing an overview comparison of the proposed Code to the old Act, the House Report said:

> The bill also continues over the exclusion from property of the estate of the debtor's interest in a spendthrift trust to the extent the trust is protected from creditors under applicable state law. The bankruptcy of the beneficiary should not be permitted to defeat the legitimate expectations of the settlor of the trust.

*Id.* at 6136.

The Senate Report similarly explained that this section "preserves restrictions on a transfer of a spendthrift trust ... enforceable under non-bankruptcy law." S.Rep. No. 95–989, 95th Cong., 2d Sess. 83, reprinted in 1978 U.S.Code Cong. & Admin. News 5787, 5869. In other words, the court in *Goff* concluded that Congress intended by its reference to "applicable non-bankruptcy law" to exempt from the estate only those spendthrift trusts traditionally beyond the reach of creditors under state law, thus continuing the previously recognized exemption for spendthrift trusts under the old Bankruptcy Act.

Second, the court in *Goff* noted that when Congress intended to refer to federal law or pension laws, including ERISA, in the Bankruptcy Code, it did so explicitly, e.g., § 522(d)(10)(E)(iii). In § 541(c)(2), however, Congress only referred to "applicable non-bankruptcy law." The court in *Goff* undertook an extensive analysis of the language Congress used when it intended to refer to federal laws or pension laws including ERISA. The court found that the overall scheme of the Bankruptcy Code precludes inclusion of ERISA in the meaning of "non-bankruptcy law" in § 541(c)(2). The court contrasted the explicit exemption of funds payable by the federal government to the debtor under § 522(b)(2)(A) with the ERISA requirement which only contains a restriction on alienation and assignment in order to qualify for tax benefits. The court held:

> "The private pension and welfare benefits sweepingly regulated by ERISA differ considerably from the publicly funded and/or created pension and welfare systems, where the few exceptional, traditionally guarded industries covered by the illustrative listings."

*Goff,* 706 F.2d at 586.

The *Goff* court then noted that while ERISA clearly preempts state law, 29 U.S. C. § 1144(a), it is clearly not intended to affect the operation of other federal law. ERISA provides, "Nothing in this [Act] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States...." 29 U.S.C. § 1144(d). The Bankruptcy Code was intended to broaden the "property of the estate" available to creditors in bankruptcy as well as to limit any exemption of pension funds from the estate. *Goff,* 706 F.2d at 587. The court therefore concluded that ERISA's specific provision precluding interference with the operation of federal law renders the Bankruptcy Code effective over any ERISA provisions to the contrary.

The reasoning of the court in *In re Goff* is persuasive. The Plan trustees make much of the fact that this interpretation will allow creditors to reach funds which ERISA intended to be protected from creditors. While this may be true in some circumstances, any other interpretation distorts the policies of both ERISA and the Bankruptcy Code. Just because a plan is ERISA qualified does not mean the funds contained therein are protected from manipulation. In fact, in the appellate court cases considering this issue, the plans in question were all ERISA qualified. If a bankruptcy trustee can never reach funds held in an ERISA-qualified pension plan, then there is too much room for manipulation by a participant anticipating bankruptcy. On the other hand, if creditors were always able to reach the funds, ERISA's protection of retirement plans would be impermissibly diluted. The spendthrift trust rule allows for consideration of both statutory schemes, protecting debtor and creditor alike.

It is true that there are many different variations of plans which qualify under ERISA and that the differences between the plans clearly affect the degree of control which the debtor has over the plan. For example, the amount which the employee contributes or the access to the funds will vary according to the terms of the individual plan. As a general rule, however, these differences do not affect this Court's decision regarding the interpretation of "non-bankruptcy law;" instead they determine whether the particular plan qualifies as a spendthrift trust (discussed below).

Accordingly, the Debtors' interests in the Plans are included in the bankruptcy estates unless the Plan qualifies as a spendthrift trust under Illinois law.

Illinois law recognizes the validity of spendthrift trusts. *Geiger v. Geer*, 395 Ill. 367, 69 N.E.2d 848 (1946). A spendthrift trust is a trust created to provide a fund for the maintenance of another while protecting the fund against the intended beneficiary's improvidence or incapacity. *See, In re DiPiazza*, 29 B.R. 916 (Bankr.N.D.Ill. 1983).

To qualify as a spendthrift trust, the beneficiary thereof must show that he or she cannot alienate his or her interest therein and that he or she does not possess exclusive and effective control over distribution or termination of the trust. *In re Dagnall*, 78 B.R. 531, 534 (Bankr.C.D.Ill. 1987). Of particular interest is the extent of the dominion and control which the beneficiary exercises over the plan's assets. *In re Peterson*, 88 B.R. 5, 7 (Bankr.D.Me. 1988) (applying Illinois law); *In re Strehlow*, 84 B.R. 241, 244 (Bankr.S.D.Fla.1988) (applying Illinois law). It is also accepted that the settlor of the trust cannot establish the trust for his or her own benefit. *Peterson,* supra.

In the case at bar, a participant can access the entire vested corpus of her pension by terminating her employment. In addition, a participant may have access to part of the Plan's assets if she chooses to seek to obtain a loan or hardship distribution from either of the Plans. Further-more, there is an exception to the anti-alienation provision for domestic relations orders. To determine whether these features of the Plan demonstrate sufficient access to or control over the corpus of the trust such that the Plan is taken outside Illinois' spendthrift trust parameters requires an analysis of each feature individually and of their cumulative impact upon the Plan.

A number of courts, including the Central District of Illinois bankruptcy court, have held that a debtor's ability to quit his job and receive a lump sum distribution from his pension plan, free and clear of claims and interests, constitutes sufficient control to disqualify the plan as a spendthrift trust. *In re Sundeen*, 62 B.R. 619 (Bankr.C.D.Ill.1986). In so holding, the bankruptcy court in *Sundeen* reasoned that, because the pension plan at issue did not qualify as a true spendthrift trust under Illinois law, it did not fall within the exclusion of ERISA. In concluding that it did not qualify as a spendthrift trust the judge stated, "the amount of control the debtor has over the pension fund is determinative of whether it qualifies as a spendthrift trust" and concluded that the fact that the debtor could quit her job and receive her interest indicated that the trust "wholly lacked the safeguards found in a spendthrift trust." *Id.* at 620.

Although the ramifications of quitting one's job simply to gain access to interests in the Plan may be sufficiently severe to prevent the abuse of this practice, the power of a beneficiary to compel total distribution of the corpus is antithetical to the nature of a spendthrift trust. Whether or not it is likely that a participant would take such extreme measures, in a true spendthrift trust there is no possible voluntary action a beneficiary can take which would initiate an early termination of the trust or invasion of the corpus. Accordingly, the Court agrees with Judge Altenberger's conclusion in *Sundeen* that a Plan with this provision is not a spendthrift trust under Illinois law.

In addition to distribution upon termination of employment, the Debtors herein

had access to the Plan's assets through the availability of loans from the Plan. Under the Basic Plan, any active participant may apply for a loan for a child's college education, the purchase of a home, or for medical expenses. The loan cannot exceed one-half of a debtor's vested interest with a minimum loan of $5,000. Paragraph 11.3

Although § 11.4 of the Plan provides that all loans must be repaid, § 11.7 provides that, if a loan is not repaid, the loan is merely to be treated as a taxable distribution to the participant. Thus, the Trustee argues that the Debtor had easy access to at least one-half of her vested balance in the Plan on the date of the petition, thus disqualifying the Plan as a spendthrift trust.

Furthermore, in § S–2.5(B) of the Basic Plan, the administrative committee is given the discretion to distribute cash not to exceed 100% of the participant's SRC account and the vested portion of her MEC account in cases where a participant has suffered "extreme financial hardship." Extreme financial hardship includes medical expenses, purchase of principal residences, payment of tuition for post-secondary education for the employee or her dependents or to prevent the eviction of an employee from a principal residence. In addition, the commission is granted authority to expand this list.

Thus, the Debtors had access to the funds at the discretion of the commission either through a loan or through a distribution for financial hardship. The Plan trustees argue, however, that the Debtors were not qualified for a loan under either of the Plans as of the petition date and that even if they did qualify, their ability to borrow from the Plans was subject to significant restrictions, including the limited number of permissible purposes and spousal consent. Furthermore, even if both of these were obtained, the administrative committee would not have been obligated to grant the Debtors a loan or a distribution for hardship, since both of these matters are at the discretion of the committee. Thus, the Plan trustees argue that access to the retirement funds was so limited that it should

not destroy the spendthrift nature of the trust.

In appellate court cases which have held that pension plans did not constitute spendthrift trusts, the debtors had virtually unfettered control over the plan assets. In *In re Lichstrahl*, 750 F.2d 1488, the debtor was an orthopedic surgeon and sole officer and director of the professional association which had created the pension plan. The debtor in *In re Graham*, 726 F.2d 1268, also a physician, was the sole stockholder, director and officer of the corporation establishing the plan. *In re Daniel*, 771 F.2d 1352 (9th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1199, 89 L.Ed.2d 313 (1986) involved a physician, sole shareholder, sole director. The Debtors in the case at bar are among hundreds of employees who participate in the plan. They are not directors, officers, or controlling shareholders of the company. They have not now and never have had the power to make investment decisions or establish the terms and conditions for distribution.

There is, however, a certain logic to the Trustee's argument. First of all, if the Debtor could have withdrawn funds in the trust account to pay off pressing creditors during a time of financial hardship, part of the trust corpus would be dissipated by such action. Thus, in setting up the trust it was envisioned that financial hardship could result in dissipation of the trust corpus. In that sense, this trust does not appear to be a spendthrift trust. There is thus no reason why the Debtors should not be required to reach those funds to which they have access in order to relieve their financial hardship.

On the other hand, however, the committee would still have the discretion to refuse any distribution. In *Danning v. Lederer*, 232 F.2d 610 (7th Cir.1956), the Seventh Circuit held that a bankruptcy trustee could not reach a debtor's interest in a spendthrift trust even though the debtor was entitled to borrow from the corpus of the trust. The court reasoned that the trustees of the trust had discretion as to whether a loan would be granted, and any loans had to be repaid with interest. Loans

were therefore just a broadening of the trustee's power to invest the trust fund.

The case at bar, however, is factually different than *Danning*. Under the Plan, once a loan is made it need not be repaid. In other words, it is within a participant's power to convert an investment into a distribution. In effect, the Plan trustee has much more power than a discretionary investment power associated with spendthrift trusts, while the beneficiary, too, has more power to compel distribution than is legally possible in a spendthrift trust.

Furthermore, the Plan in question provides an exception to the anti-alienation clause for domestic relations orders. Paragraph 12.2. Although it is not entirely clear under what circumstances the corpus can be invaded by court order, it is certain that the anti-alienation clause is not absolute. If a court can order invasion of the corpus of a trust in order to satisfy a participant's legal obligations to third parties, then by definition, the trust is not a spendthrift trust.

The Plan trustees' arguments relating these Debtors' inability to qualify for loans are to no avail. In determining whether a particular trust qualifies as a spendthrift trust, the issue is not whether one particular beneficiary can or cannot invade the corpus but whether the trust itself was settled in such a way as to preclude invasion by the beneficiary.

■ The participants in this Plan exercise a certain degree of control over the corpus of the funds in their accounts. While the degree is certainly far less than the control present in some of the cited cases, it is also far more than that allowable under Illinois spendthrift trusts. For all these reasons, the Court finds that the ERISA plans in question here do not qualify as spendthrift trusts under Illinois law. The Debtors' interests in the Plans are therefore part of their bankruptcy estates.

The issue now becomes one of defining just what those interests are. The Plans' trustees argue that the Debtors had, at the time of the petition, no entitlement to any mandatory distribution; the Trustee, therefore, is entitled to no distribution either.

On the other hand, the Trustee argues that he stepped into the shoes of the Debtors at the time the petitions were filed; therefore he (and not the Debtors) is now the Plan participant. Because there is no employment relationship between the Trustee and the Company, the Trustee can compel a lump sum distribution of the Debtors' entire interests according to the terms of the trust. Alternatively, the Trustee argues that he is entitled to those funds voluntarily contributed by the Debtors.

■ In a number of cases, courts have found that, where the debtor was not entitled to a present distribution at the time of the petition, the bankruptcy Trustee was not entitled to one either. *See, In re Huff,* 61 B.R. 678, 684–85 (N.D.Ill.1986); *In re Loe,* 83 B.R. 641 (Bankr.D.Minn.1988), and *In re DeWeese,* 47 B.R. 251 (Bankr.W.D.N.C.1985). If a debtor does not possess an asset or a present right to demand, merely filing a petition for bankruptcy cannot create it. The Court agrees that the Trustee is only entitled to the property or assets which the Debtors could demand.

The Court rejects the Trustee's characterization of the effect of filing a bankruptcy petition. It is legally incorrect to say that the Trustee's stepping into the shoes of the Debtor means that the Trustee becomes the Debtor. It simply means that any right to assets which the Debtor may possess is now held by the Trustee. The filing of a petition does not terminate an employee's relationship with an employer, nor does it increase the amount of assets in which the debtor may have held an interest; it merely changes the party who can demand or claim the assets.

Furthermore, the Trustee's assertion that he is at least entitled to the contributions made directly by the Debtor to the Plan, even in the absence of fraud, diminishes the consideration given by Congress to the issue of exemption. It does not contravene the policies of the Bankruptcy Code for a debtor to maximize the exclusions to which she is entitled, any more than it contravenes the policy of the Tax Code for a taxpayer to claim all exemptions and deductions to which she is entitled.

Accordingly, because the Debtor in this case was not entitled to a distribution of any nature from the Plan at the time of filing the petition, the bankruptcy Trustee is not entitled to compel a turnover of the assets sought herein. The only right to which the Trustee has succeeded is the right to apply for a loan or hardship distribution from the Plan.

In summary, interests in ERISA plans are not automatically exempted from bankruptcy estates. On the contrary, such interests are included as property of the bankruptcy estate unless the plan itself qualifies as a spendthrift trust under state law. In this case, the Plan does not qualify because the participants have too much control over and access to the funds. However, the Debtors have no present absolute right to compel distribution. Accordingly, the bankruptcy Trustee, who has stepped into the shoes of the Debtors, has no right to compel distribution either.

The bankruptcy Trustee's Motion for Summary Judgment is DENIED and the Plan trustee's Motion for Summary Judgment is GRANTED. This case is REMANDED to the Bankruptcy Court for further proceedings in accordance with this Order.